IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Pamela Timms, | ) |
| Plaintiff, | ) Civil Action No. 6:07-1748-TLW-WMC |
| | ) **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) |
| | ) |
| Michael J. Astrue, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income benefits under Title XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff protectively filed her application for supplemental security income (SSI) benefits on April 8, 2003, alleging that she became unable to work on April 1, 2002. The application was denied initially and on reconsideration by the Social Security Administration. On December 31, 2004, the plaintiff requested a hearing. The administrative law judge, before whom the plaintiff, her attorney, a witness and a vocational

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

expert appeared on September 25, 2006, considered the case *de novo*, and on October 19, 2006, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on April 19, 2007. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)    The claimant has not engaged in substantial gainful activity since April 1, 2002, the alleged onset date (20 CFR 416.920(b) and 416.971 *et seq.*).
>
> (2)    The claimant has the following severe impairments: anxiety related disorders (3000) and essential hypertension (4010) (20 CFR 416.920(c)).
>
> (3)    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416. 926).
>
> (4)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform at a light residual functional capacity. Specifically, the claimant is capable of lifting up to ten pounds frequently and up to twenty pounds occasionally, walking and/or standing for six or more hours during the workday, and is able to fully use her hands, arms, feet, etc. The claimant's residual functional capacity is further limited to a workplace that is relatively free of hazards and hazardous machinery; requires no operating motor vehicles or hazardous machinery; has limited public interaction; and consists of simple, repetitive tasks performed in a stable, routine environment.
>
> (5)    The claimant has no past relevant work (20 CFR 416.965).
>
> (6)    The claimant was born on October 17, 1965 and was 37 years old on the date the application was filed, which is defined as a younger individual age 18-44 (20 CFR 416.963).
>
> (7)    The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

(8)    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

(9)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

(10)    The claimant has not been under a "disability," as defined in the Social Security Act, since April 8, 2003 (20 CFR 920(g)), the date the application was filed.

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.


## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."    42 U.S.C. §423(a).    "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing

3

substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

4

preponderance.  If there is evidence to justify a refusal to direct a  verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The record reveals that the plaintiff was 41 years old at the time of the ALJ's decision.  She has an eighth-grade education and has never worked.

In 1999, the plaintiff sought treatment for anxiety, hypertension, and dizziness (Tr. 133-34, 139-43).  She was hospitalized in November 1999 with "chronic dizziness since about 10 years of age."  Laboratory work-up showed a throat infection, but was essentially unremarkable otherwise.  CT scans of her brain, abdomen, and pelvis were normal.  The physicians felt the dizziness "was of an acute nature," and recommended she take her medications, be slow in her movements, perform vestibular (balance) exercises, and lose weight (Tr. 136-38).  A carotid ultrasound to evaluate dizziness in 2000 was normal (Tr. 149-50).

From July to October August 2002, Dr. Stephen Worsham, the plaintiff's family physician, treated her for complaints including hypertension, dizziness, anxiety, and depressive symptoms, and encouraged her to lose weight (Tr. 189, 191-93).

On November 8, 2002, Dr. Claud Perry removed the plaintiff's gallbladder laparoscopically (Tr. 151-59, *see also* Tr. 188, 196, 203).

5

In January 2003, the plaintiff weighed over 350 pounds and her blood pressure was elevated but improved. Dr. Worsham prescribed an anti-obesity medication, recommended exercise and caloric restrictions, and told the plaintiff if she could improve her lifestyle and lose weight within six months he would refer her for obesity surgery (Tr. 187). In February 2003, Dr. Worsham noted the plaintiff appeared very depressed and that her blood pressure was still elevated. He also noted,

> [S]he is not doing well on any type of oral assisted weight loss or anorexic agents. She is very poorly motivated. She is not walking or exercising and I very much seriously doubt if she has dietary compliance and focus. She states she still keeps having these spells intermittently of dizziness and weakness and it in unclear if it is some type of partial seizure or what by her history.

(Tr. 186). Dr. Worsham ordered an EEG, which was normal (Tr. 160-63, 195, 201-02).

In April 2003, the plaintiff was "doing fairly well." Examination was unremarkable except for somewhat elevated blood pressure. Dr. Worsham added an appetite control medication and adjusted the plaintiff's other medications (Tr. 185). The following month, she weighed over 350 pounds and her blood pressure was 130/90.[2] Dr. Worsham recommended water aerobics and noted the plaintiff had "some mixed success in activity, although her mother is trying to act very much to inspire her to be more active and get her to walk with her on a regular basis" (Tr. 184).

In July 2003, Dr. Hugh Clark, a State agency physician, found the plaintiff's dizziness and obesity were "severe,"[3] but that there were "no significant limitations in activity or function resulting" from the obesity (Tr. 269). He concluded she could lift 20 pounds occasionally and 10 pounds frequently; stand/walk or sit about six hours each in an eight-

---

[2] 120/80 is considered "normal" blood pressure, and 140/90 or higher is considered "high" blood pressure. *See* http://www.nlm.nih.gov/medlineplus/highbloodpressure.html.

[3] An impairment is severe if it has more than a minimal effect on a claimant's ability to do basic work activities. *See* Social Security Ruling (SSR) 96-3p; 20 C.F.R. §§ 416.920(a), 416.921; *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984).

hour workday; frequently climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds, and that she should avoid hazards (Tr. 259-66).

In August 2003, Dr. Worsham noted that the plaintiff "felt well," was "doing well on dietary regimen" and that her "headaches, hypertension, and hyperlipidemia [were] all under control." He diagnosed "[p]olyarthritis, currently controlled with current regimen" (Tr. 183).

On October 10, 2003, Dr. Worsham noted the plaintiff was "doing fairly well," but was having anxiety due a recent breakup from her husband. She weighed over 350 pounds and her blood pressure was 142/84. Dr. Worsham increased the plaintiff's antidepressant medication (Tr. 182).

In September 2003, the plaintiff presented to Brian Keith, Ph.D., for a psychological evaluation. Dr. Keith noted the plaintiff could care for her personal needs, get along with others, and sometimes sweep, wash clothes and dishes, and talk on the phone. The plaintiff said she could not work because she had "spells" and could not be in crowds. On examination, she was fully oriented and had a somewhat blunted affect, sufficient judgment, intact reasoning, sufficient range of ideas, coherent and linear conversation, suspect remote memory, and very slow psychomotor functioning. Dr. Keith noted the plaintiff was quite dependent on her mother and appeared to have borderline to low average cognitive functioning and some limitations in daily functioning, but could manage her own funds and had overall adequate concentration. He diagnosed "adjustment disorder with depression as it relates to her impending divorce." He also noted that the plaintiff "has never worked and does not appear to be motivated to work at the present time. . . . Given the fact that she has never worked, [Plaintiff] would have to receive training and/or educational opportunities, which would provide her the necessary skills to find employment" (Tr. 168-71).

7

On October 16, 2003, Xanthia Harkness, Ph.D., a State agency psychologist, found the plaintiff had "moderate" limitations with detailed instructions and interacting with the general public, but was "not significantly limited" in all other areas of work-related mental functioning. She explained that the plaintiff was able to understand, remember, and carry out short and simple instructions and that she would "perform best in situations that do not require ongoing interaction with the public." She further stated that the plaintiff's "symptoms would not interfere with satisfactory completion of a normal workday/week or require an unreasonable number of rest or cooling off periods" (Tr. 178-80). Dr. Harkness also completed a psychiatric review technique form and found that the plaintiff had "moderate" limitations in activities of daily living; no difficulties with social functioning; "moderate" difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation (Tr. 224-37).

In August 2004, Dr. Worsham noted that the plaintiff was "active," "doing fairly well," and had lost five pounds. Her blood pressure was 138/68. Dr. Worsham diagnosed "[d]egenerative disc disease, currently controlled. Pain controlled" (Tr. 181, 280).

On November 17, 2004, the plaintiff presented to Spurgeon Cole, Ph.D., for psychological evaluation. Dr. Cole noted the plaintiff was not unduly depressed, but was anxious and in mild to moderate emotional distress. She had no history of mental health treatment. On examination, she had normal speech, "okay" psychomotor movements, and adequate communication skills and concentration. She said she could care for her personal needs, cook, clean, do laundry, and visit friends when she was not dizzy, but did not grocery shop, eat out, or attend church. Dr. Cole found she had adequate social skills and that her cognitive ability likely fell in the borderline or mildly mentally retarded range. He diagnosed only generalized anxiety disorder and concluded:

> Obviously the dizziness would be her primary problem obtaining and maintaining employment, but she also has a lot of anxiety and it may be the anxiety causing the dizziness. She has

8

limited cognitive ability. She did concentrate adequately. She
was not distractible [sic] and she remained focused during the
evaluation. Her social functioning is limited. Her daily activities
are limited by her dizziness.

(Tr. 204-06).

On November 19, 2004, the plaintiff was "doing fairly well" and had lost an
additional four pounds. Her blood pressure was 132/64. She complained of low back pain
from polyarthritis and had fallen down and injured her right shoulder. Dr. Worsham advised
her to be more cautious in ambulation and continued her medications (Tr. 279).

On November 22, 2004, the plaintiff presented to Dr. Rebecca Hopkins for
physical evaluation. The plaintiff said her dizzy spells occurred every three to four days and
that she also had problems with her "nerves." On examination, she weighed 337 pounds
but was able to get on and off the examination table without difficulty. Her blood pressure
was 140/94 and she had full extremity strength with no clubbing, cyanosis, or edema; intact
cranial nerves; trace but equal deep tendon reflexes; and a wide-based gait due to obesity.
Dr. Hopkins diagnosed morbid obesity, vertigo, anxiety, and hypertension. She concluded,
"[b]ecause of this patient's obesity she is going to have trouble finding a job. However, if
she can lose weight, and she noted she had already lost 80 pounds; if she can continue to
do this she could probably hold down a job" (Tr. 207-09).

On December 14, 2004, Dr. George Chandler, a State agency physician,
concluded the plaintiff could lift 20 pounds occasionally and 10 pounds frequently;
stand/walk or sit about six hours each in an eight-hour workday; and occasionally climb,
balance, stoop, kneel, crouch, and crawl, and that she should avoid exposure to hazards
(Tr. 35, 251-58).

On December 16, 2004, a State agency psychologist (whose name is not
legible on the report) concluded the plaintiff had "moderate" limitations with detailed
instructions, maintaining attention and concentration for extended periods, and setting

9

realistic goals, but was "not significantly limited" in all other areas of work-related mental functioning (Tr. 172-77). The psychologist also completed a psychiatric review technique form, concluding that the plaintiff had "moderate" limitations in activities of daily living; "mild" difficulties with social functioning; "moderate" difficulties with concentration, persistence, or pace; and no episodes of decompensation (Tr. 210-23).

In January 2005, Dr. Worsham noted the plaintiff was "doing much better ... has continued to lose weight on a steady ebb . . . ." She had lost an additional three pounds (down to 334) and her blood pressure was 130/90. Examination was unremarkable except for "some osteoarthritis in her lower extremities bilateral knees, especially from her morbid obesity." He recommended over-the-counter Advil (Tr. 278).

In February 2005, Dr. Worsham reported the plaintiff she was "doing fairly well," but had injured her right ankle. She had gained four pounds and her blood pressure was normal. Dr. Worsham prescribed an ankle support wrap and continued her medications (Tr. 277).

In September 2005, the plaintiff had gained eight pounds but her blood pressure was normal. Dr. Worsham noted she had low back pain and polyarthritis in her lower extremities and continued her medications and ankle brace (Tr. 276).

In January 2006, the plaintiff complained of back pain. She weighed 334 pounds and her blood pressure was normal. Dr. Worsham continued her medications (Tr. 275).

In March 2006, the plaintiff was "doing well," but had increased depressive symptoms. She weighed 336 pounds and her blood pressure was normal. She had inflammation of the inner ear with vertigo symptoms and polyarthritis in the low back. Dr. Worsham changed her antidepressant medication (Tr. 274).

In April 2006, the plaintiff was "doing fairly well" and had been participating in water aerobics, but had increased symptoms of sleep apnea. She weighed 336 pounds

and her blood pressure was near normal.  Examination showed allergic rhinitis, mild rhonchus in the lungs, low back pain, and polyarthritis in the extremities (Tr. 273).

In June 2006, the plaintiff had lost six pounds and her blood pressure was normal.  Examination showed knee and ankle pain (Tr. 272).  In July, she weighed 339 pounds and her blood pressure was normal.  Examination showed low back pain.  Dr. Worsham recommended sleep apnea studies (Tr. 271).

In September 2006, the plaintiff presented to Dr. Dennis Chipman for an independent psychiatric evaluation.  She said her dizzy spells sometimes occurred three to four times a day, causing nausea and difficulty walking.  Dr. Chipman noted she had become depressed at least since separating from her husband three years prior, and that this condition had been helped by Lexapro.  She had never had mental health treatment.  She said she cared for her personal needs, watched television, occasionally attended church, and sometimes visited friends or went out to eat.  Mental status examination showed she was anxious and had a "somewhat sad and hypostimulated" affect, but was fully oriented and had reasonable insight and judgment and fair memory.  Dr. Chipman diagnosed generalized anxiety disorder; possible depressive disorder, not otherwise specified (NOS); dependent personality disorder; and a GAF score of 50.[4]  He concluded that the plaintiff "appear[ed] to have become somewhat of a chronic invalid since age 13-15" due to her dizzy spells, which Dr. Chipman felt were caused by "some type of significant 8th nerve[5] pathology."  He concluded that the plaintiff's dizziness, depression, anxiety, and obesity ...

---

[4]A Global Assessment of Functioning (GAF) score is a snapshot of a condition at one point in time. A GAF of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See Diagnostic and Statistical Manual* (2000) (DSM-IV), *available on* Stat!Ref Library Cd-ROM (4th Qtr. 2007).

[5]The eighth cranial nerve, also known as the "acoustic nerve," "consists of two separate parts: the vestibular and cochlear nerves . . . The acoustic nerve relays impulses for the special senses of hearing and equilibrium. *See Taber's Cyclopedic Medical Dictionary* (Taber's) (20th ed. 2005), *available on* Stat!Ref Library CD-ROM (4th 2007).

... in aggregate, produce at least a moderate level of impairment most of the time; although perhaps any one at a single point in time would always be producing mild - moderate impairment. Additionally, she has very limited work experience (in fact, none), and, also has described a history of poor anger control. This all adds up to the likelihood that she would have much difficulty getting through any kind of workday, and, also relating to co-workers or supervisors in any semblance of normal manner. Her symptoms have become virtually fixed.
* * *
The condition is chronic and can be expected to last 12 months or more. The patient is competent to manage any funds which may be awarded on her behalf.

(Tr. 281-84).

At the hearing on September 25, 2006, the plaintiff testified she was 5'5" and weighed 330 pounds (Tr. 294). She said she was married when she was 18 and that she had two adult children (Tr. 309). She said she had cared for her kids the best she could with the help of her husband, but that her kids actually cared for her when they got older (Tr. 312). She said she and her husband separated in September 2003 (Tr. 311). She said her mother drove her to the hearing, and that she did not have any problems with the 30-minute trip (Tr. 295).

The plaintiff said her worst problem was her frequent "dizzy spells," which began when she was about 15 and had gotten worse, and that she now has them three or four times a week for up to four days at a time (Tr. 296-98, 299). She said she had to lie down and needed help to even go to the bathroom during a dizzy spell (Tr. 297, 300). She said her depression medication had "help[ed] some" with her dizzy spells (Tr. 298). She said that in the 22 years in between her hospitalization at age 15 and her treatment by Dr. Worsham, she had "just dealt with" her dizziness (Tr. 299, 307). She said she had never driven or worked because of her dizzy spells, and that she had never even applied for a job because she "was scared I was going to be sick or something and I never did try to get one" (Tr. 295, 296, 300, 310). In addition to her dizziness, the plaintiff said she had an injured

12

shoulder, low back pain, difficulty sleeping, and possible sleep apnea (Tr. 302-03, 305-06). She said she also "forg[o]t stuff real easy," and sometimes had problems concentrating, completing tasks, and being around people (Tr. 304-05). She said she worried a lot about "getting sick, getting dizzy, or falling down or whatever" and that she had never had treatment from a mental health professional (Tr. 306, 310-11).

The plaintiff testified she did not have any problems that limited her ability to lift, bend, stoop, squat, use her hands or arms, sit, or stand, although her dizziness and weakness precluded her from walking "a long ways" (Tr. 300-02). She said Dr. Worsham recommended exercise when she told him about her weakness upon walking (Tr. 302). She said she exercised when she felt like it and had lost "[a] good bit of weight" (Tr. 302). She said she did not have problems with reading or writing, and had difficulties with math but could make change (Tr. 293-94). She said she spent her days watching television and napping (Tr. 303, 308-09). She said her parents did the shopping and cooking, but that she sometimes cleaned the house, helped with cooking, and went to church with her parents (Tr. 303). She said she needed help with personal care when she was "sick" (Tr. 304). She said she did not have side-effects from her medications (Tr. 304). When asked why she chose an onset date of April 2002, the plaintiff stated she had "been sick for a long time having the spells and stuff . . . [a]nd so [she] decided to try to put in for it to see if I could get, you know, to see if I can, you know, get some help or something" (Tr. 295-96).

The plaintiff's mother testified that the plaintiff was hospitalized for dizzy spells at age 15, and that this was one of the reasons she quit school (Tr. 314). She said the doctor at that time suggested that it might be "some kind of nerve in . . . the left side of [Plaintiff's] head" causing her dizziness, but that "we never really figured out what was causing it" (Tr. 314). She said the plaintiff's condition had gotten worse over the years and that she had dizzy spells at least three or four times per week, lasting "hours" (Tr. 314, 320-21). She said the plaintiff had never worked because "she stayed sick constantly all the

13

time" (Tr. 315).  She said the plaintiff had never driven (Tr. 315).  She said that the plaintiff's husband did not help with the kids or household chores and that she helped the plaintiff take care of her kids and handle household duties "about every day or every other day" even when the plaintiff was married (Tr. 315-17).  She said the plaintiff lived with her and was not really able to assist with cooking, cleaning, or grocery shopping, but sometimes went to church with her (Tr. 318).  She said the plaintiff spent her days lying down and could not hold even a part-time job (Tr. 319).  She said she currently worked full-time, but that she worked nearby and could take the plaintiff to the doctor and check on her when necessary (Tr. 319-21).

Karl Weldon, Ph.D., a vocational expert, testified that a hypothetical individual limited to unskilled,[6] light work[7] with no exposure to hazards, operation of motor vehicles, using hazardous equipment; only limited public interaction; only simple, repetitive work; and a very repetitive, routine type position, could perform the representative unskilled light jobs of kitchen helper (900 jobs in the upstate South Carolina region); machine tender (2,100 jobs in the region, 106,000 jobs in the nation); and inspector (2,200 jobs in the region, 148,000 jobs in the nation) (Tr. 324-25).  He also testified that the same individual limited to sedentary work[8] could perform the representative unskilled sedentary jobs of grader/ sorter (1,200 jobs in the region, 102,000 jobs in the nation); inspector (900 jobs in the region, 87,000 jobs in the nation); and machine tender (1,100 jobs in the region, 104,000

---

[6]"Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. . . . [A] person can usually learn to do the job in 30 days . . . " 20 C.F.R. § 416.968(a).

[7]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . ." 20 C.F.R. § 416.967(b). It is generally presumed that someone who can do light work can also do sedentary work. *Id.*

[8]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools . . . " 20 C.F.R. § 416.967(a).

14

jobs in the nation) (Tr. 325).  He stated his testimony was based on the DOT[9] as well as his own professional experiences, and that there were no conflicts between his testimony and the DOT (Tr. 326).   Dr. Weldon testified that "moderate" difficulties in maintaining concentration, persistence, or pace would not affect the jobs he identified (Tr. 326).  He said that no jobs would accommodate an individual unable to complete tasks or be productive more than the equivalent of three days per month (Tr. 327-28).

## ANALYSIS

As discussed above, the plaintiff alleges disability since April 1, 2002.  She claims disability because of dizziness, anxiety, depression, morbid obesity, dependent personality, and poor anger control.  The ALJ  found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council.  The plaintiff alleges that the ALJ erred by (1) failing to properly assess her medical records and evidence; (2) failing to perform a proper credibility analysis; and (3) rendering a decision that was not supported by substantial evidence.

### *Medical Evidence*

The plaintiff argues that the ALJ did not properly consider all of the medical evidence in making his determination that she was not disabled.  This court agrees.  The ALJ concluded that the plaintiff was not so limited by her impairments that she could not perform the minimal demands of a reduced range of simple, repetitive work in a stable and routine environment that did not require exposure to hazards or significant public interaction (Tr. 19).

---

[9]U.S. Dept. of Labor, *Dictionary of Occupational Titles* (DOT) (4th ed., Rev. 1991).

15

The plaintiff was seen by Brian Keith, Ph.D., for a psychological evaluation in September 2003. He noted that plaintiff was quite dependent on her mother and appeared unmotivated to work. He diagnosed an adjustment disorder with depression as it related to the plaintiff's impending divorce. He stated that since the plaintiff had never worked she would have to receive training and/or educational opportunities to provide her the skills to find employment (Tr. 168-171).

On November 17, 2004, Dr. Spurgeon Cole evaluated the plaintiff and concluded that "[h]er cognitive ability is either in the mild mentally retarded range or possibly borderline cognitive range. It is difficult to determine or estimate her IQ because she only has an eighth grade education, she has never worked, and does not have a drivers license" (Tr. 205).

Dr. Keith, a consulting psychologist, concluded that the plaintiff was fully oriented and had adequate concentration. He noted that she suffered an adjustment disorder due to marital problems and did not seem motivated to work. Dr. Harkness, a state agency psychologist, also concluded that the plaintiff could perform light work and her "psychological symptoms would not interfere with satisfactory completion of a normal workday/week or an unreasonable number of cooling off periods" (Tr. 178-80).

The ALJ found that the plaintiff's anxiety disorder "has a moderate restriction on her activities of daily living, a mild restriction in maintaining social functioning, and a moderate restriction in her ability to maintain concentration, persistence, and pace." He further found that the plaintiff had no episodes of decompensation (Tr. 18).

The plaintiff also alleges that she has been experiencing frequent dizzy spells since age 15, which preclude her ability to work. The plaintiff was hospitalized in November 1999 with "chronic dizziness since about 10 years of age." Laboratory work-up showed a throat infection, but was essentially unremarkable otherwise. CT scans of her brain, abdomen, and pelvis were normal. The physicians felt the dizziness "was of an acute nature," and recommended she take her medications, be slow in her movements, perform

16

vestibular (balance) exercises, and lose weight (Tr. 136-38). A carotid ultrasound to evaluate dizziness in 2000 was normal (Tr. 149-50). During her treatment with Dr. Worsham, the plaintiff seldom complained of dizziness. However, when she did mention dizziness, Dr. Worsham did not provide any specific treatment, impose any limitations for dizziness, or find it necessary to further evaluate the alleged condition, suggesting that it was not as serious as the plaintiff alleged. Dr. Chipman believed that the dizziness could be related to an "8th nerve pathology," yet other examinations revealed that the 8th nerve was intact (Tr. 181-83, 185-89, 191-93, 275-80). The ALJ noted that the plaintiff just "dealt with" her dizziness and did not seek treatment for 22 years" (Tr. 19). *See, e.g, Mickles v. Shalala*, 29 F.3d 929, 930 (failure to seek medical attention inconsistent with complaints of disability).

While it appears that the ALJ considered the plaintiff's dizziness and mental issues individually, the ALJ did not properly consider the plaintiff's impairments in combination with each other. In a disability case, the combined effect of all a claimant's impairments must be considered without regard to whether any such impairment, if considered separately, would be sufficiently disabling. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'" *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

Further, the ALJ failed to properly consider the plaintiff's obesity in accordance with SSR 02-1p. SSR 02-01p recognizes that obesity can cause limitations of function in sitting, standing, walking, lifting, carrying, pushing, pulling, climbing, balancing, stooping, crouching, manipulating, as well as the ability to tolerate extreme heat, humidity, or hazards.

17

SSR 02-01p, 2000 WL 628049, *6. The Ruling further states that "individuals with obesity may have problems with the ability to sustain a function over time" and that "[i]n cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity." *Id.* The Ruling also states:

> The combined effects if obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

*Id.* Further, "[a]s with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations." *Id.* at *7. Upon remand, the ALJ is instructed to consider whether obesity caused any physical or mental limitations *and* explain how he reached his conclusion.

The medical evidence shows that during the period at issue the plaintiff was 5'5" tall and weighed between 330 to over 350 pounds. She has been diagnosed with morbid obesity. In January 2003, the plaintiff weighed over 350 pounds. Dr. Worsham prescribed an anti-obesity medication, recommended exercise and caloric restrictions, and told the plaintiff if she could improve her lifestyle and lose weight within six months he would refer her for obesity surgery (Tr. 187). In July 2003, Dr. Hugh Clark, a State agency physician, found the plaintiff's obesity was "severe," but that there were "no significant limitations in activity or function resulting" from the obesity (Tr. 269). Dr. Hopkins, who evaluated the plaintiff in November 2004, stated that the plaintiff was "going to have trouble finding a job" due to her obesity (Tr. 207-209). In January 2005, Dr. Worsham stated that the plaintiff had "some osteoarthritis in her lower extremities bilateral knees, especially from her morbid obesity" (Tr. 278). In September 2006, Dr. Chipman stated that the plaintiff's dizziness, depression, anxiety, and obesity "in aggregate, produce at least a moderate level of impairment most of the time . . . " (Tr. 284).

18

The ALJ did not address the plaintiff's obesity in his decision. The defendant argues that "while the ALJ did not expressly discuss Plaintiff's obesity, the evidence did not show functional limitations from obesity in excess of those imposed by the ALJ in limiting her to a reduced range of light work" (def. brief p. 18). The defendant's post-hoc rationalizations for the ALJ's failure to consider the plaintiff's obesity are inappropriate. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). The above evidence shows that the plaintiff's obesity is a severe impairment as it has "more than a minimal effect on a claimant's ability to do basic work activities." *See* SSR 96-3p. Clearly the impairment should have been considered by the ALJ in combination with the plaintiff's other impairments. Accordingly, upon remand, the ALJ should be instructed to consider the plaintiff's obesity in accordance with SSR 96-2p, and the ALJ should be further instructed to analyze the cumulative or synergistic effect of the various impairments on the plaintiff's ability to work.

### Credibility

The plaintiff next argues that the ALJ failed to properly assess her credibility. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . .
> It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity

19

and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, *4.

In addition to the objective medical evidence, the factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

 (1) the individual's daily activities;

 (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;

 (3) factors that precipitate and aggravate the symptoms;

 (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

 (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

 (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

The ALJ found as follows with regard to the plaintiff's credibility:  "After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible."  The ALJ further noted that, considering the above-referenced factors in SSR 96-7p, the plaintiff's testimony was "not substantiated by the longitudinal medical evidence contained in the record" (Tr. 19).

The ALJ properly considered the subjective testimony of the plaintiff.  The plaintiff testified that she could not walk long distances, yet her doctor advised her to exercise (Tr. 300-02).  The plaintiff also testified that she has been experiencing dizziness since the age of 15, with it progressively getting worse.  However, she stated that for 22 years she merely dealt with her dizziness and did not seek medical care.  Although suffering from anxiety and depression, she sought no mental health care other than the pharmacological treatment offered by her treating physician (Tr. 19).  *See, e.g, Mickles v. Shalala*, 29. F.3d 918, 929-30 (4th Cir. 1994) (failure to seek medical attention inconsistent with complaints of disability).  The plaintiff also admitted that her impairments did not affect her ability to lift, bend, use her limbs, sit, or stand (Tr. 19, 300-02).  Furthermore, the ALJ also noted that the plaintiff had never worked and did not seem to have any motivation to work (Tr. 19, 170).  *See English v. Shalala*, 10 F.3d 1080, 1084 (4th Cir. 1993) (lack of motivation to work is a factor the ALJ can consider in assessing credibility).  This court agrees with the defendant that the ALJ properly evaluated the credibility of the plaintiff's subjective complaints, as his opinion contained specific reasons for the finding on credibility supported by the evidence in the case record.

21

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.


s/William M. Catoe
United States Magistrate Judge

June 16, 2008

Greenville, South Carolina

22